IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| LMT ASSOCIATES, LLC | CIVIL ACTION |
|---|---|
| v. | NO. 17-3565 |
| THE OHIO CASUALTY INSURANCE COMPANY | |

Baylson, J.                                                                                           June 29, 2017

## MEMORANDUM RE: DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### I. Introduction

In this insurance dispute over the benefits owed to Plaintiff after a fire of Plaintiff's insured property, Plaintiff alleges that Defendant has improperly delayed, and refused to pay, sufficient insurance benefits to Plaintiff.

For the reasons discussed below, Defendant's Motion for Partial Summary Judgment will be GRANTED, and the case will proceed only as to Plaintiff's breach of contract claim.

### II. Procedural Background

This case began on July 10, 2017, with Plaintiff LMT Associates, LLC filing a Complaint (ECF 1) against Defendant, The Ohio Casualty Insurance Company, in the Court of Common Pleas of Philadelphia. (See ECF 19-2 (Statement of Material Facts in Support of Defendant's Motion for Summary Judgment, hereinafter "SOF") ¶ 1). Defendant removed the matter to this Court on August 9, 2017, and answered the Complaint on September 25, 2017. (SOF ¶¶ 2-3).

The Complaint alleges two counts. Count I seeks damages for Defendant's breach of an insurance contract by virtue of Defendant's denial of insurance coverage. Count II seeks damages for Defendant's bad faith and wrongful refusal to pay for Plaintiff's covered loss, in violation of 42 Pa.C.S. § 8371.

## III. Factual Background

The underlying policy at issue in this case pertains to the premises located at 259-261 South 17th Street in Philadelphia, Pennsylvania. (SOF ¶ 4). On July 26, 2016, a fire took place at the building in question, and Plaintiff, the owner of the building, reported fire and smoke damage to Defendant. (SOF ¶ 5). This was the first of many interactions between Plaintiff and Defendant over the ensuing twelve months, culminating in the filing of this lawsuit. Because the reasonableness of Defendant's delay is at issue, an understanding of the detailed history of the parties' interactions is necessary for resolution of this motion:

1. On July 26, 2016, Defendant's representative, Peter DelGaone, spoke with Plaintiff's representative and scheduled an inspection of the property for July 29, 2016. (SOF ¶ 6).
2. On July 29, 2016, the "first inspection" of the property took place. (Id. ¶ 7). Among those who attended the inspection were DelGaone and **Plaintiff's retained public adjuster, Marc Grossman**. (Id.). The inspection revealed the presence of damage. (Id. ¶ 8-9).
3. On August 4, Grossman spoke via telephone with **Defendant's representative, Paul Barnett**, and scheduled an inspection of the property for August 8, 2016. (Id. ¶ 12).
4. On August 8, the "second inspection" took place. (Id. 14). Barnett and Grossman attended the second inspection, with Defendant's building construction consultant Michael Lee also present. (Id.)
5. On August 13, Barnett sent a letter to Plaintiff providing a summary of Plaintiff's policy coverages and advising on the status of the claim. (Id. ¶ 15).
6. On August 17, Barnett advanced $20,000 to Plaintiff to begin repairs. (Id. ¶ 16).
7. Also on August 17, Barnett instructed Lee to contact Grossman for another inspection of the property. (Id. ¶ 17).
8. On August 23, 2017, Lee reinspected the property (the "third inspection").
9. On August 29, 2016, Barnett sent a letter to Plaintiff advising that the claim was still being investigated. (Id. ¶ 19).
10. On September 6, 2016, Barnett wrote to Grossman inquiring as to the status of Grossman's repair estimate. (Id. ¶ 20).

11. On September 8, 2016, **Defendant's building construction consultant Louis Collisson**[1] sent his repair estimate to Barnett. (Id. ¶ 21). The repair estimate totaled $236,821.56 replacement cost value and $195,225.41 actual cash value. (Id. ¶ 22). Barnett emailed a copy of Collisson's estimate to Grossman, stating that it was "subject to revision as we need to see what the tenant [Branzino Ristorante] is claiming and what their carrier [Utica First Insurance Company] is paying for to make sure there is no duplication." (Id. ¶ 23).

12. On September 30, Grossman emailed Barnett, seeking approval to begin demolition and repairs. (Id. ¶ 25).

13. On October 3, Barnett responded to Grossman's email, recommending an additional inspection of the building with Plaintiff's contractor and Defendant's building construction consultant to ensure agreement about the scope of demolition, as well as the scope of what Utica First Insurance Company intended to pay for, in the event they extended coverage. (Id. ¶ 26).

14. On October 19, Barnett, Grossman, and Collisson reinspected the loss (the "fourth inspection." (Id. ¶ 28). They agreed that Defendant was not responsible for the finishes, so Collisson was to revise his estimate to reflect this change. (Id.)

15. On October 24, Barnett informed Grossman that Collison's estimate allowed for cleaning (rather than other repairs) of the plaster walls. (Id. ¶ 29). Grossman disagreed that cleaning the plaster was sufficient. (Id.).

16. On October 28, Barnett issued a second advance to Plaintiff in the amount of $20,000, and informed Grossman via email that he was "looking to make arrangements to get a 2nd opinion on the plaster." (Id. ¶ 30).

17. On November 3, Barnett, Grossman, and Collisson again inspected the property (the "fifth inspection"), as a result of which Barnett and Collisson concluded that the plaster could be cleaned. (Id. ¶ 31).

18. On November 4, Barnett emailed a copy of Collisson's revised repair estimate to Grossman. (Id. ¶ 33). The revised estimate totaled $106,285.91 replacement cost value and $90,808.54 actual cash value, a six-figure reduction from the prior estimate. (Id. ¶ 34).

19. Also on November 4, Grossman wrote to Barnett advising that he believed Collisson's estimate was "way off." (Id. ¶ 35).

20. On November 5, Barnett suggested that Plaintiff's contractor and Collisson jointly inspect the property. (Id. ¶ 36).

21. On November 10, Barnett sent an email to Grossman attaching a Proof of Loss form and inquiring whether Grossman remained interested in the idea of a joint inspection. (Id. ¶ 37).

22. On November 17, Barnett issued payment in the amount of $45,808.54. (Id. ¶ 38).

---

[1] Collisson and Lee both worked for Defendant's building consultant, Grecco Construction Consultants. Grossman, Barnett, and Collisson played the biggest roles in the events leading to this litigation.

23. On November 21, Barnett wrote to Grossman again inquiring whether he wanted to schedule a reinspection of the property. (Id. ¶ 39).[2]
24. Having received no response, Barnett emailed Grossman on December 7 inquiring as to the status of the claim. (Id. ¶ 40).
25. On December 15, 2016, Grossman replied to Barnett stating that the insured was "out of the country again," and that the matter was not resolved. (Id. ¶ 41).
26. Also on December 15, Barnett wrote to Grossman asking "why we need the insured if we[']re doing a reinspection," and stating that "I thought the insured was in a rush here." (Id. ¶ 42).
27. On December 20, Barnett again emailed Grossman to "follow[] up on prior e-mail for a status." (Id. ¶ 43).
28. On January 13, 2017, Barnett emailed Grossman yet again to "advise on a status here." (Id.).
29. Having received no response from Grossman, Barnett sent a letter to Grossman on January 29, 2017, explaining that "the last correspondence we had from you was on 12/7/16 in which you advised that the insured was out of the country. You indicated you would get back to us upon their return to discuss the resolution of this claim. Can you advise[] if the insured has returned and when we can expect to hear from you to discuss the status of this claim." (Id. ¶ 44).
30. On February 16, Barnett received a "General Ledger" purporting to show Plaintiff's repair costs. (Id. ¶ 45).
31. Also on February 16, Barnett wrote to Grossman, questioning various reported expenses and their relatedness to the loss. (Id. ¶ 47).
32. On February 23, Grossman sent an estimate to Barnett which reportedly represented the differences between Grossman's estimates and those of Defendant's construction consultants. (Id. ¶ 48).
33. Also on February 23, Grossman informed Barnett that he was still waiting on additional documentation from Plaintiff, and that after he provided the documentation to Defendant, they could discuss possible resolution of the claim. (Id. ¶ 49).
34. On March 8, Barnett emailed Grossman to ask when Defendant could expect his final submission for review. (Id. ¶ 50).
35. On March 24, Barnett received a one-page document reportedly showing Plaintiff's damages estimate as $443,200. (Id. ¶ 51).
36. Also on March 24, Barnett wrote to Grossman requesting all supporting invoices for the losses claimed on the one-page submission. (Id. ¶ 52).

---

[2] Plaintiff denies this fact on the ground that "Defendant's Exhibit 'I' represents an email sent on August 17, 2016." This nonsensical denial ignores that Defendant cited Exhibit "T," not Exhibit "I," and that Exhibit I stands for the exact proposition for which it is cited. Plaintiff's denial does not create any genuine dispute as to this fact.

37. Later that same day, March 24, Grossman wrote to Barnett, clarifying the amount of his earlier, one-page submission as $242,000. (Id. ¶ 53).

38. On March 30, Barnett again sought any supporting documentation invoices or work orders to support Grossman's $202,000 determination. (Id. ¶ 54).

39. On April 13, Barnett emailed Grossman inquiring when he would like to discuss the claim. (Id. ¶ 56).

40. On April 27, after reviewing Grossman's documentation, Collisson revised his repair estimate to be $112,613.01 replacement cost value and $95,459.01 actual cash value. (Id. ¶ 59).

41. Also on April 27, Barnett wrote to Grossman advising of the adjustments in Collisson's estimate and requesting supporting documentation for Grossman's figures. In the same email, Barnett asked for "a breakdown of just what the tenant's [Branzino Ristorante's] carrier Utica paid for as a result of this loss. I note the lease says the landlord is not responsible for repairing or replacing any of the tenant's leasehold improvements." (Id. ¶ 60).

42. On May 17, Barnett wrote to Grossman inquiring whether he would be submitting additional records for review. (Id. ¶ 61).

43. On May 23, Barnett responded that he would "be submitting a full ledger of expenses and materials." (Id. ¶ 62).

44. Between May 23 and May 27, Barnett received another General Ledger from Grossman which purported to list Plaintiff's expenses. (Id. ¶ 63).

45. On May 27, Barnett wrote to Grossman requesting that Grossman meet with Collisson and Barnett to reach an "understanding as to how these figures relate to the loss." (Id. ¶ 64).

46. On June 13, Barnett, Grossman, and Collisson met. Barnett told Grossman that Defendant did not agree about the scope of repairs performed by Plaintiff. Barnett requested supporting documentation from Plaintiff for the work performed. (Id. ¶ 65).

47. The instant lawsuit was filed on July 10, 2017. (Id. ¶ 67).

### IV. Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

**V. Discussion**

Defendant seeks summary judgment only as to Count II, asserting that Defendant at all times acted reasonably and in good faith in its handling of Plaintiff's claim. In opposition to the motion, Plaintiff asserts that Defendant purposely delayed payment and released funds far below the amount due and owed under the policy.

**A.     Cause of Action for Bad Faith**

42 Pa.C.S. § 8371 allows plaintiffs to recover interest, punitive damages, court costs, and attorneys' fees for bad faith conduct by insurers in denying benefits or handling claims. See

Terletsky v. Prudential & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994). The term "bad faith" concerns "any frivolous or unfounded refusal to pay proceeds of policy." Toy v. Metro. Life Ins. Co., 928 A.2d 186, 199 (Pa. 2007) (quoting Black's Law Dictionary 139 (6th ed. 1990)). "[M]ere negligence or bad judgment does not constitute bad faith; knowledge or reckless disregard of a lack of a basis for denial of coverage is necessary [and] [e]ven questionable conduct giving the appearance of bad faith is not sufficient to establish it so long as the insurer had a reasonable basis to deny coverage." Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 523 (3d Cir. 2012). To state a claim for bad faith, a plaintiff must allege sufficient facts to establish that (1) the insurer lacked a reasonable basis for denying the benefits under the policy and (2) the insurer knew or recklessly disregarded its lack of reasonable basis. Id. at 522 (citing Condio v. Erie Ins. Exch., 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006)).

Bad faith can also be predicated on the insurer's improper delay in paying an insurance claim. To establish a claim of bad faith based on the insurer's delay, the plaintiff must show that (1) the delay was attributable to the insurer; (2) the insurer had no reasonable basis for causing the delay; and (3) the insurer knew or recklessly disregarded the lack of a reasonable basis for the delay. Mirarchi, 564 F. App'x 652, 655–56 (3d Cir. 2014). The plaintiff bears the burden of establishing delay by clear and convincing evidence. Williams v. Hartford Cas. Co. Ins. Co., 83 F. Supp. 2d 567, 571 (E.D. Pa. 2000), aff'd, 261 F.3d 495 (3d Cir. 2001). A long period of time between demand and settlement does not, on its own, necessarily constitute bad faith. Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 582, 589 (E.D. Pa. 1999), aff'd, 234 F.3d 1265 (3d Cir. 2000). "[I]f delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred." Williams, 83 F. Supp. 2d at 572 (quotation omitted) (holding that a delay of fifteen months to resolve a claim—during which the insurer took the

insured's deposition nine months after notification of the claim, waited one year before taking the insured's deposition and waited fourteen months to obtain a vocational assessment— was not an unreasonable length of time so as to rise to the level of bad faith, even though the insurer could have completed its investigation with greater speed); Quaciari v. Allstate Ins. Co., 998 F. Supp. 578, 582–83 (E.D. Pa.), aff'd, 172 F.3d 860 (3d Cir. 1998) (holding that even if all delay were attributable to the insurer, a period of approximately thirteen months between notification and resolution of the claim through arbitration would not, without more, be sufficient to establish bad faith).

### B. Discussion

Plaintiff asserts that Defendant acted without a reasonable basis by (1) only releasing funds far below the amount due and owed under the policy," and (2) "purposely delaying payment." (Resp. to MSJ, ECF 20, at 19). Each assertion will be addressed in turn.

#### 1. Bad Faith Denial of Funds

Even when viewing all evidence in the light most favorable to Plaintiff, Plaintiff has failed to present clear and convincing evidence showing that Defendant lacked a reasonable basis for the final amount it released to Plaintiff. It is insufficient for Plaintiff to merely state that losses due to fire and smoke damages were "covered . . . under the policy" such that Defendant "was contractually obligated to insure [Plaintiff] for their loss." Plaintiff cites to the following pieces of evidence to support its contention that Defendant lacked a reasonable basis for its eventual insurance benefit award:

(1) Defendant's initial damage estimate was $150,000 to $200,000 (citing Plaintiff's Exhibit D, at 24-25);[3]

(2) Defendant continuously questioned LMT's estimates;

---

[3] Note that Plaintiff did not file its own statement of undisputed facts, as permitted by this Court's rules.

- (3) Defendant inspected the property six times; and
- (4) One of Defendant's stated reasons for needing additional inspections (determining what the tenant, Branzino Ristorante, was claiming with its insurer, to ensure there were no duplicative payments for repairs) was invalid because Defendant's obligations were not contingent on the insurance policy between the tenant and its insurance company.

Taken together, this evidence fails, as a matter of Pennsylvania law, to reach the clear and convincing standard required for bad faith claims. Deviating from the initial estimate (made on the date of the first inspection) is weak evidence, at best, to support a bad faith claim, which requires evidence of a "frivolous or unfounded refusal to pay proceeds of policy." Toy, 928 A.2d at 199. Continuous questioning, and persistent inspection, might support the contention that Defendant unreasonably delayed payment, discussed *infra*, but both are likely immaterial to whether Defendant lacked a reasonable basis for the eventual insurance payment.

Plaintiff's fourth piece of evidence, above, is similarly insufficient, in tandem with the first three, to reach the clear and convincing standard required under Pennsylvania law. Again, if Defendant delayed without a reasonable basis for doing so, that fact pertains to whether there was bad faith in delaying payment. (See *infra*). It does not, without more, show that Defendant lacked a reasonable basis for the amount eventually paid.

To the extent that Plaintiff and Defendant disagree about the scope of insurance benefits duly owed to Plaintiff, Plaintiff must properly pursue its claim as a breach of contract cause of action. As a matter of law, even viewing the evidence in the light most favorable to Plaintiff, Plaintiff has not presented clear and convincing evidence that Defendant exhibited bad faith in reaching its final calculations.

## 2. Bad Faith Delay of Payment

Plaintiff's second argument is that Defendant exhibited bad faith in delaying payment. However, this argument also fails, because Plaintiff fails as a matter of law to reach the clear and convincing standard. Again, Plaintiff relies on the second, third, and fourth pieces of evidence referenced above, as well as the undisputed fact that the time between the initial claim and the filing of the lawsuit was more than eleven months. However, this Court notes that the time between the initial claim and the final payment of a total of at least $85,808.54 was less than four months.

What Plaintiff refers to as "continuous questioning" of its estimates reflects, upon review of the evidence, a reasonable basis for delay. Plaintiff's submissions to Defendant always received a timely response, and the "questioning" was consistent throughout: Defendant sought invoices and other supporting documentation for Plaintiff's claims, which far exceeded Defendant's determinations. See Williams, 83 F. Supp. 2d at 572 ("[I]f delay is attributable to the need to investigate further . . . no bad faith has occurred.").

Each of the six inspections had a reasonable basis. Extensive, contemporaneous documentation, attached to Defendant's undisputed statement of facts, supports each of the bases that Defendant submits it had for the inspections.

The first inspection took place three days after the reported loss, with Grossman and Defendant's initial adjuster, DelGaone.

However, Barnett then was assigned the claim, and he retained an expert to prepare a damages estimate. The second inspection featured that expert, Michael Lee, together with Barnett and Grossman. As a result of that inspection, Barnett advanced $20,000 to Plaintiff to begin repairs.

Nevertheless, the second inspection was cut short due to time constraints so a third inspection, which took place six days later, was necessary.

A fourth inspection took place because Grossman sought approval to start repairs but the scope of what the tenant's insurer would pay remained unclear. Thus, Collisson (Lee's colleague), Barnett, and Plaintiff contractor made a "walk through" of the building to ensure agreement about the scope of the proposed demolition and to determine Plaintiff's contractor's cost estimate.

The fifth inspection, with Barnett, Grossman, and Collison present, required a revision of Collison's estimate, based on a determination that Defendant was not responsible for finishes. Nonetheless, as a result of the inspection, Barnett issued a second $20,000 advance to Plaintiff.

Grossman disagreed with Collisson's determination that the plaster walls could be cleaned, asserting that the plaster needed to be removed instead. Therefore, a sixth inspection was made, with Barnett, Collison, and Grossman present, which resulted in a determination that the plaster could, in fact, be cleaned. Seven days later, Barnett issued funds to Plaintiff reflecting the amount that Collisson determined, through his estimate, remained duly owed to Plaintiff (i.e., the total amount owed minus the $40,000 that had already been advanced).

Plaintiff claims, without evidence, that Defendant demanded repeated inspections "so that it could have its expert revise his estimate lower." (Resp. to MSJ, at 19). Plaintiff also claims that "each time that [Plaintiff] made a demand for payment, [Defendant] tried to schedule a new inspection." (Id.). Again, these sentences are without citation, and because Plaintiff did not avail itself of the Court's Rules permitting them to submit an affirmative statement of facts, this Court concludes that they have presented no evidence to support these contentions. Moreover, this Court notes that although Plaintiff did not file suit until July, 2017, nearly twelve months

after making its initial demand, Defendant's six inspections were completed before the end of November, 2016, and thus were conducted in the span of less than four months from the time of the initial claim. Therefore, to the extent that Plaintiff asserts the inspections were "duplicitous" or pretextual, such assertions are without any basis in the factual record.

Finally, Plaintiff asserts that Defendant's "obligations [to pay Plaintiff] are not contingent on the policy of insurance between third-parties Branzino Ristorante [the tenant] and Utica First Insurance Company [tenant's insurer] or any payments made thereunder." (Id. at 20). Plaintiff bears the burden of showing, by clear and convincing evidence, that Defendant lacked a reasonable basis for delaying payment to Plaintiff. However, Plaintiff presents no support, legal or otherwise, to support this contention.[4]

Therefore, Plaintiff has failed to present evidence rising to the level of the clear and convincing standard required under Pennsylvania law demonstrating that Defendant lacked a reasonable basis for delay of payment proceeds to Plaintiff.[5]

## VI. Conclusion

Defendants' Motion for Summary Judgment (ECF 19) is hereby GRANTED. The case shall proceed only as to Count I of the Complaint. An appropriate order follows.

O:\CIVIL 17\17-3565 LMT Associates v Ohio Casualty\Memo re Partial MSJ.docx

---

[4] As a matter of common sense, a landlord's insurer should not be expected to pay insurance benefits for repairs for which the tenant is legally responsible. Otherwise, the landlord's insurer would have to pay a windfall amount, inuring to the benefit of the landlord, even where the tenant received insurance benefits from its insurer for the exact same repairs.

[5] Plaintiff has also failed as a matter of law to show that Defendant knew or recklessly disregarded the lack of a reasonable basis for the delay.